2012-1533, -1534

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

KYD, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

POLYETHYLENE RETAIL CARRIER BAG COMMITTEE,
HILEX POLY CO., LLC, AND SUPERBAG CORPORATION,

Defendants-Cross Appellants.

Appeals from the United States Court of International Trade
in case no. 09-0034, Chief Judge Donald C. Pogue

————————————————

Combined Response and Reply Brief of Plaintiff-Appellant KYD, Inc.
————————————————

DAVID J. CRAVEN
DAVID A. RIGGLE
RIGGLE & CRAVEN
8430 W. Bryn Mawr, Ste. 525
Chicago, IL 60631
(312) 368-8787
dcraven@tradelaw.com

Counsel to Plaintiff-Appellant

February 12, 2013

2012-1533, -1534

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

KYD, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

POLYETHYLENE RETAIL CARRIER BAG COMMITTEE,
HILEX POLY CO., LLC, AND SUPERBAG CORPORATION,

Defendants-Cross Appellants.

Appeals from the United States Court of International Trade
in case no. 09-0034, Chief Judge Donald C. Pogue

_____

Combined Response and Reply Brief of Plaintiff-Appellant KYD, Inc.
_____

DAVID J. CRAVEN
DAVID A. RIGGLE
RIGGLE & CRAVEN
8430 W. Bryn Mawr, Ste. 525
Chicago, IL 60631
(312) 368-8787
dcraven@tradelaw.com

Counsel to Plaintiff-Appellant

February 12, 2013

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____ v. _____

No. _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

_____
_____
_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____
_____
_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____
_____
_____

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

_____
_____

| September 17, 2012 | | /s/ David J. Craven |
| --- | --- | --- |
| Date | | Signature of counsel |
| | | David J. Craven |
| | | Printed name of counsel |

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................i

TABLE OF AUTHORITIES ................................................................. iii

I.     SUMMARY OF ARGUMENT................................................1

II.    ARGUMENT ....................................................................2

    A)    RESPONSE TO BRIEF IN CHIEF OF DEFENDANTS-
        CROSS APPELLANTS ........................................................2

        1)    The Court Of International Trade Did Not Usurp The
             Department's Authority By Addressing Certain Legal
             Questions In The First Instance ...................................3

        2)    The Trade Court Did Not Err When It Found that KYD
             Had Rebutted the *Rhone Poulenc* Presumption.......................5

            i.    KYD Provided Facts Which Overcame the *Rhone
                 Poulenc* Presumption.......................................5

            ii.    The  Court's Factual Findings With Respect to
                 Normal Value Were Not Flawed.....................................8

        3)    The Court of International Trade Did Not Improperly
             Deprive Commerce of an Opportunity to Address
             Whether *Gallant Ocean* Precludes the Application of the
             *Rhone-Poulenc* Presumption to Merchandise Exported by
             Master Packaging.....................................................10

        4)    The 122.88 Percent Rate Was Not Properly Corroborated
             and was Properly Rejected by the Court...................................11

    B.    REPLY TO THE RESPONSE OF DEFENDANT AND THE
        RESPONSIVE PORTION OF THE BRIEF-IN-CHIEF OF
        DEFENDANTS-CROSS APPELLANTS ...........................................13

1)     The Eighth Amendment Argument is Properly Before This Court .................................................................15

      i.       The Eighth Amendment  Argument Was Properly Presented And Considered By The Court Of International Trade And Was Not Waived When Not Raised In The Remand ............................................15

      ii.       The Argument Applying The Eighth Amendment Is Meritorious..................................................................18

2)     Commerce Erred When It Did Not Consider KYD's Purchase Prices in Determining the Margin Which Would Apply to KYD .............................................................22

      i.       The Department Has Calculated Rates Which Apply to Fully Cooperative Respondents Using Data from Diverse Sources...........................................22

      ii.       The *Rhone Poulenc* Presumption Doctrine Requires Consideration of KYD's Price Data...............24

      iii.       Any Court Decision Would Apply Only to KYD and not to the Uncooperative Foreign Producers ...........25

3)     The Selected AFA Rate is Not In Accordance With Law ........27

      i.       Corroboration of the Rate was Required ........................27

      ii.       The Rate Was Not Corroborated ....................................28

III.    CONCLUSION...................................................................30

## TABLE OF AUTHORITIES

Cases

*Atar Srl v. United States,*
36 CIT ___, Slip Op. 12-101 (July 31, 2012) ................................................ 8, 9

*Austin v. United States,*
509 US 602 (1993) ....................................................................................... 18

*Bond Street Ltd. v. United States,*
35 CIT ___ , 774 F. Supp. 2d 1251 (2011) ....................................................... 17

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. US,*
No. 2011-1080 (Fed. Cir. Dec. 17, 2012) ........................... 3, 9, 14, 22, 23, 25, 26

*Gallant Ocean (Thailand) Co., Ltd. v. United States,*
602 F. 3d 1319 (Fed. Cir. 2010) ................................................ 1, 2, 10, 11, 27, 28

*KYD, Inc. v. United States,*
607 F.3d 760 (Fed Cir. 2010) ....................................................................... 25

*KYD, Inc. v. United States,*
35 CIT ___, Slip Op. 11-49 (April 28, 2011) ................................................ 15, 16

*PAM, S.p.A. v. United States,*
582 F.3d 1336 (Fed. Cir. 2009) ........................................................ 12, 27, 28, 29

*Rhone Poulenc, Inc. v. US,*
899 F.2d 1185 (Fed. Cir. 1990) ....................................................................... 5, 6

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
298 F. 3d 1330 (Fed. Cir. 2002) ................................................................... 12, 27

*United States v. Bajakajian,*
534 U.S. 321 (1998) ..................................................................................... 18

*United States v. Halper,*
490 US 435 (1989) ..................................................................................... 20, 21

Statutes

19 U.S.C. §1677e(a)(1) ............................................................................ 9

19 U.S.C. §1677e(b) ............................................................................. 10

I.    **SUMMARY OF ARGUMENT**

- The Court of International Trade did not address certain legal arguments in the first instance. The issue of price disparity between KYD and the mandatory respondents was argued by KYD before the Department and the CIT.

- KYD Rebutted The *Rhone Poulenc* Presumption.

  - The data provided by KYD was significant, and was so recognized by the Court of International Trade. KYD was never asked by the Department to supplement, clarify, or explain its information, and thus had no opportunity to provide any additional facts after the initial response.

  - While KYD could not provide all of the information necessary to determine a rate, the Department has found, and the courts have approved, the use of extrinsic information to calculate a rate.

  - The purpose of the *Rhone Poulenc* presumption is to obtain cooperation from interested parties. Where an interested party has cooperated to the best of its ability there can be no benefit from applying adverse inferences, either directly or indirectly, to that party.

- The Court of International Trade did not err by taking cognizence of the legal decision in *Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F. 3d 1319 (Fed. Cir. 2010), notwithstanding that it was not originally argued administratively. The Gallant Ocean decision was issued subsequent to the first remand and completion of briefing in the case below.

- The AFA rate applied to KYD was not corroborated, and exceeded even the highest outlier margins for the mandatory respondents.

- The Eighth Amendment argument was presented administratively and to the Court of International Trade. The Court of International Trade made a determination on the issue, which could only be the subject of an interlocutary appeal until the underlying case was resolved and thus is properly before the CAFC in this appeal to determine whether the assessment of antidumping duties based on AFA on a fully cooperative interested party was excessive.

- Any decision benefiting KYD will not affect any other respondent to the review.

## II. ARGUMENT

### A) RESPONSE TO BRIEF IN CHIEF OF DEFENDANTS-CROSS APPELLANTS

The portion of the Brief in Chief ("PRCC Brief") of Defendants-Cross Appellants Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC and Superbag Corp (hereafter "PRCC") devoted to its direct challenge to the decision of the Court of International Trade striking down the 122.68% AFA rate presents a number of argument against the decision.  These arguments are without merit and have as a common thread the PRCC's theory that KYD, Inc. ("KYD") a fully cooperative interested party, can be subject to a very high AFA based rate based on the conduct of an unrelated interested party and can take no steps to show that such rate is inappropriate.  Such an argument goes against a sense of fundamental fairness as reflected in recent decisions of the Court of Appeals for the Federal Circuit.  As noted by this Court in *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. US,* No. 2011-1080 (Fed. Cir. Dec. 17, 2012).

> Quite the contrary: applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute. . . . Although the hypothetical AFA rate was not *directly* applied to a cooperating respondent, cooperating respondents were the *only* entities impacted by the recalculated rate.

*Changzhou Wujin Fine,* No. 2011-1080 at 20-21.

3

In this matter, the evidence is clear. KYD cooperated fully and completely with the Department. KYD provided all of the information in its possession including information which the petitioners stated "**raises serious new issues which were — from Petitioners' perspective — entirely unexpected**." (Petitioners Letter of February 4, 2008 at 2, (Emphasis Added) (JA 386.). The indirect application of an adverse rate to KYD undercuts the cooperative promoting goal of the AFA statute. If the 122.88% rate is reinstated, the natural consequence will be the non-cooperation of importers in future reviews and investigations.

1)      **The Court Of International Trade Did Not Usurp The Department's Authority By Addressing Certain Legal Questions In The First Instance**

In the PRCC Brief at pages 8 to 14, it argues that the Court of International Trade usurped the Department's authority by purportedly addressing certain legal questions in the first instance. Specifically, the PRCC points to the chart of data points assembled by the Court from data of record and argued that this assembly of data points usurped the agency function. The PRCC also argued that KYD had not presented a similar analysis regarding the pricing relative to the cooperative respondents.

KYD submits that this challenge is without basis. Initially, as reflected in KYD's comments on the first remand results and its brief of September 9, 2011

4

(JA 1794-1814), the price disparity between KYD and the mandatory respondents, including specific prices for KYD and the mandatory respondents (JA 1806 - 1807) was placed before the Court and the Department. While this argument was not presented in the same form and at the same level of detail, the argument was presented to the Court. The Court's action was simply the implementation of the argument presented by KYD. Furthermore, the Court only took this action after the first remand, in which the Department had not complied with the first remand instructions

In sum, the actions of the Court were proper and merely expanded upon the argument presented by KYD, and was a proper excerpting of the facts of record. It was a proper response by the Court in light of the Department's then ongoing refusal to consider the data.

### 2)    The Trade Court Did Not Err When It Found That KYD Had Rebutted The *Rhone Poulenc* Presumption

#### i.    KYD Provided Facts Which Overcame The *Rhone Poulenc* Presumption

In the PRCC brief at pages 14 to 17, the PRCC argues that KYD did not overcome the *Rhone Poulenc* presumption. Under this presumption, the Department assumes that if an interested party believes that the AFA rate is excessive, it will provide information showing that the rate is excessive. *Rhone*

*Poulenc, Inc. v. US*, 899 F.2d 1185, 1190 (Fed. Cir. 1990). The purpose of this presumption is to obtain the highest degree of cooperation.

The PRCC does not deny that KYD provided information, but rather argues that since KYD only provided information regarding U.S. sales, and not normal value, it failed to rebut this presumption.

The PRCC argues that the submission of only one set of data, which was not identical to the data submitted by the other mandatory respondents, precludes giving any weight to the KYD data. The PRCC identifies a number of "flaws," such as use of the wrong sales database for the other producers, which it claims that Commerce would have investigated and corrected. (PRCC Brief at 15-17.)

The PRCC's argument is facile and ignores many key facts. It would effectively render impossible the ability of an importer, a statutory interested party, (19 U.S.C. § 1677(9)(A)) to cooperate and avoid the application of AFA.

Initially, KYD's submission of its data occurred early in the process. Its data response was submitted on January 23, 2008. (JA 216) The Department neither asked KYD any questions, nor sought further clarification, of this data. It is unchallenged that the data submitted by KYD contained all of the information within its possession. The challenge is simply that KYD did not itself have all of the necessary information. Had the Department asked KYD questions, KYD might have been able to clarify and resolve any questions about its data. For example,

6

the PRCC cites as a flaw the unit conversions suggesting that the size of the punchouts are important.  KYD, in its data response modeled on the Department questionnaire, reported all of the physical characteristics regarding the size and pattern of the bag.  (Fields 3.2 to 3.5) (JA 260 – 262).   KYD did not report the "punchout" because the Department did not include it in the questionnaire, except as a part of field 3.2 which asked about the type of bag,  and never asked KYD for this additional information in a supplemental questionnaire.

Secondly, while KYD did not seek to clarify its data set, it never had reason to do so, nor did it have an opportunity to do so.   The Department never asked any questions to KYD, and as KYD's data was submitted at the deadline for the submission of factual information, KYD was effectively gagged and prevented from further amplifying the record.  See 19 C.F.R. §351.301(b)(2).   KYD was unable to submit any further data absent a request for information from the Department.  In contrast, as evidenced by the existence of multiple datasets, the other respondents received numerous supplemental questionnaires from the Department and were able to provide clarifications of their responses.

Thirdly, while KYD's data set may have had some flaws, the relationship of the prices paid by KYD and obtained by the other producers, even with flaws, would not result in any disparity in margins.  Even if the data were not sufficient to

calculate a rate for KYD, it was still sufficient to rebut the *Rhone Poulenc* presumption.

Certainly the *Rhone Poulenc* presumption was not intended to "force" cooperation only when a party is capable of providing full and complete data. While KYD may not have provided full and complete data because such data was not in its possession, it unquestionable provided very valuable information – important information which would otherwise have been unknown to the Department and to the domestic interested parties.

In sum, the data provided by KYD to rebut the *Rhone Poulenc* presumption was significant, and was recognized by the Court of International Trade as such. KYD did exactly what was contemplated by the AFA statute when it fully cooperated.

### ii.    The  Court's Factual Findings With Respect To Normal Value Were Not Flawed.

In the PRCC brief at pages 18 to 22 the PRCC argues that the findings with regard to normal value were flawed as KYD provided no data regarding normal value.  This argument is predicated, in part, on the improper conclusion that normal values can only be calculated based on the data of a respondent.  This is simply incorrect.  The Department calculates margins using normal value and factors for normal value from other respondents.  For example, in *Atar Srl v.*

*United States*, 36 CIT ___, Slip Op. 12-101 (July 31, 2012) (*appeal pending* Ct. No. 13-1001), the Department of Commerce substituted for the data of plaintiff-respondent Atar various financial ratios based on the data of other mandatory respondents from a prior period of review. While the specific data selected to substitute for Atar's own data is still to be determined, the basic principle that missing data can be filled in by data from other producers from outside the period of review is settled.

In a similar fashion, in *Changzhou Wujin Fine* the Department of Commerce used as normal value all of the data of one cooperative respondent in calculating a rate for another cooperative respondent and used as U.S. price the data of other sources.[1] Again, as with *Atar*, the specific data to be used is still to be finally determined. However, the basic principle that normal value can be ascertained partially by using the value(s) of other producers without any reference to the nature of the goods is well settled.

The statute provides that the Department may make a determination based on available facts (19 U.S.C. §1677e(a)(1)) without the taking of adverse

---

[1] "Commerce calculated a new, hypothetical AFA rate of 30.94%, which it based on Wujin Water's verified normal value data and unverified U.S. price data obtained from the non-cooperating respondent BWA." *Changzhou Wujin Fine,* No. 2011-1080 at 9. One of the issues was the identical to that presented here: "whether Commerce acted arbitrarily when recalculating the separate rate assigned to . . . a cooperative respondent."

9

inferences under 19 U.S.C. §1677e(b).   The Department had numerous data sources to use where "necessary information is not available on the record."

In this matter, the normal value for the other respondents was a reasonable substitute for normal value information that was simply unavailable to KYD.  To require that a party provide both normal value and U.S. price in order to rebut the *Rhone-Poulenc* presumption would create the absurd situation where an unrelated innocent importer,[2] such as KYD, could <u>never</u> rebut the presumption because it would never have access to the data for normal value, while an importer related to the uncooperative producer could rebut the presumption because it could obtain the data through its related, yet uncooperative, producer.

>   **3)**   **The Court Of International Trade Did Not Improperly Deprive Commerce Of An Opportunity To Address Whether *Gallant Ocean* Precludes The Application Of The *Rhone-Poulenc* Presumption To Merchandise Exported By Master Packaging**

The Trial court found that the *Rhone-Poulenc* presumption did not apply to Master Packaging as it was a new exporter.  The trial court based this decision on *Gallant Ocean (Thailand) Co., Ltd. v. United States,* 602 F. 3d 1319 (Fed. Cir. 2010), and made a finding that the application of the *Rhone Poulenc* presumption

---

[2] No allegations have been made that KYD participated in any scheme to evade antidumping duties.  The only "conduct" engaged in by KYD was the purchase of retail carrier bags by KYD at a price which KYD perceived as a fair market price. The mere purchase of product by a company that turns out not to be forthright, should not result in the imposition of crushing duties.

was not permitted.  The PRCC argues that this was impermissible since this issue had not been argued by KYD.  This argument, while true, is not relevant.

The decision in *Gallant Ocean* was issued on April 16, 2010.  The final results in this matter were issued in early January 2009. (JA 1544)   In fact, this litigation had already advanced, with the first remand plus the briefing on that remand completed prior to the decision in *Gallant Ocean.*  (JA 6).  It is simply impossible for a party to brief a point of law, as supported by a specific authority, when the underlying authority has not been issued.  Further, the question resolved by the Court was a question of law and the underlying facts were not in issue.  The PRCC's position would have the trial Court ignore superceding legal authority. The question was a matter of law and the Court properly applied the new case law to the uncontested facts.

### 4)    The 122.88 Percent Rate Was Not Properly Corroborated and was Properly Rejected by the Court

In the PRCC brief at pages 24 to 26, the PRCC argues that the 122.88% rate was properly corroborated because there was no evidence that KYD's dumping margin would have been lower than that assigned to the other importers.

Initially, KYD submits that the Trial Court examined the price data, both of KYD and the other mandatory respondents, and the data outliers in the record. The record demonstrated that none of the outlier margins calculated for the other

mandatory respondents were as high as the selected rate. The PRCC would have the Court expand the corroboration standard of *PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009), *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F. 3d 1330 (Fed. Cir. 2002) and their progeny in which a limited number of outlier margins in excess of the selected margin were found sufficient to corroborate the margin, to a standard where a selected margin was "corroborated" by outlier margins which are not as high as the selected margin. Such analysis would render the corroboration provision meaningless as a margin would be considered corroborated if an outlier was either above, or below, the selected rate.

Secondly, KYD submits that the argument presented by the PRCC would essentially render the *Rhone Poulenc* presumption meaningless. KYD submitted all of the information in its possession. KYD did not know, nor was it in privity with, any of the other importers. None of these other importers cooperated with the Department. Adopting the PRCC's interpretation would essentially deprive an entire class of interested parties – importers – of the right to avoid the impact of adverse inferences by cooperating with the Department.

As noted in the brief in chief of KYD, the purpose of the Adverse Facts provision is to obtain cooperation from interested parties. KYD cooperated fully and completely. There is no allegation that KYD did not cooperate. Quite to the contrary, KYD submitted information which petitioners stated "**raises serious new**

**issues** which were — from Petitioners' perspective — **entirely unexpected**."
(Petitioners Letter of February 4, 2008 at 2, (Emphasis Added) (JA 386.).

In sum, the 122.88% margin was not corroborated, nor can it be corroborated. Such margin exceeded even the outlier margins for the mandatory respondents.

## B. REPLY TO THE RESPONSE OF DEFENDANT AND THE RESPONSIVE PORTION OF THE BRIEF-IN-CHIEF OF DEFENDANTS-CROSS APPELLANTS

The Brief of the Defendant-Appellee United States ("US Brief") and a portion of the Brief-in-Chief ("PRCC Brief") of Defendants-Cross Appellants Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC and Superbag Corp ("PRCC") are devoted to a response to the Brief-in-Chief of KYD, and present a number of arguments against KYD's brief. These arguments are without merit and have a common thread – that a U.S. importer is essentially powerless to challenge an AFA rate assigned because of an uncooperative producer and the fully cooperative importer must bear the full impact of the lack of cooperation of the unrelated producer. Such an interpretation turns the entire AFA provision on its head.

If the Court of International Trade's decision stands, the AFA provision will not only **not encourage** the full cooperation and participation of importers such as

KYD, it **will deter** such cooperation and/or participation of importers, who are members of the class of interested parties under 19 U.S.C 1677(9)(A).

This Court has recognized that the purpose of the AFA provision is to encourage, not deter cooperation, and that the application of an adverse rate to a cooperative respondent undercuts the AFA provisions. In *Changzhou Wujin Fine,* the Court stated:

> Quite the contrary: **applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute**. . . . Although the hypothetical AFA rate was not *directly* applied to a cooperating respondent, cooperating respondents were the *only* entities impacted by the recalculated rate.

*Changzhou Wujin Fine,* No. 2011-1080 at 20-21 (Emphasis Added).

In this matter, the facts are clear. Plaintiff-Appellant KYD cooperated fully and completely with the Department. It provided all of the information in its possession including information which the petitioners stated "**raises serious new issues** which were — from Petitioners' perspective — **entirely unexpected**." (Petitioners Letter of February 4, 2008 at 2, (Emphasis Added) (JA 386.). It could not have cooperated further.

Had KYD **not** cooperated, at worst it would have ended up in the same situation, and could well have ended up in a better position. If the decision of the Court of International Trade is affirmed and applied in this case, there will be no incentive for cooperation, and a significant incentive for non-cooperation. The

14

indirect application of an adverse rate to KYD clearly undercuts the cooperative promoting goal of the AFA statute.   In contrast, recognizing KYD's exemplary conduct and high degree of cooperation would further advance the cooperation promoting goal of the AFA statute.

### 1)    The Eighth Amendment Argument is Properly Before This Court

#### i.    The Eighth Amendment  Argument Was Properly Presented And Considered By The Court Of International Trade And Was Not Waived When Not Raised In The Remand

Both the  Brief of Defendant United States, at pages 33 to 36 , and the PRCC brief at pages 27 to 32, argue that KYD waived its 8th Amendment argument as it was not included in the comments filed by KYD on the second remand and it is thus not before the Court.  KYD submits that this interpretation does not agree with the facts of record and that KYD properly did not present this issue in its comments on the second remand.

KYD submits that the issue of the 8th Amendment was presented to the agency and it issued its decision on the 8th Amendment.  (See Remand Results of Sept. 2, 2010 at 29-31) (JA 1759-61).  This issue was also considered by the Court of International Trade in Slip Op. 11-49.   In its opinion the Court stated:

> The court need not address KYD's Eighth Amendment claim.   A statutorily proper AFA rate is remedial rather than punitive and a "punitive" rate is statutorily improper.

*KYD, Inc. v. United States*, ("KYD III"), 35 CIT ___, Slip Op. 11-49 (April 28, 2011) (Citations Omitted)

This was a final determination by the Court.  However this determination was not ripe for appellate review when issued because any appeal would have been interlocutory and total relief might have been provided on other grounds.  This issue continued to be ripe for appeal when a final determination on all issues was rendered by the Court of International Trade.

Under the determination in KYD III, either the rate was not properly calculated, and thus the 8th Amendment would not apply as the rate would necessarily be recalculated, or the rate was properly calculated and thus was not violative of the 8th Amendment.  In the subsequent remand the issue of the 8th Amendment was not raised as it had already been conclusively addressed by the trial court.  Had counsel addressed it, counsel might well have been subject to sanctions for raising a frivolous argument regarding a matter for which the trial court had issued a decision.

The first, and only, opportunity to have the trial court re-consider this issue was a motion for re-consideration after the final determination of the Court.  This was done.  The Court of International Trade refused to reconsider this finding and

reiterated the trial court's view that a rate calculated under the Antidumping law was remedial, and thus proper.

The trial court cited *Bond Street Ltd. v. United States,* 35 CIT ___ , 774 F. Supp. 2d 1251 (2011) for the proposition that claims and arguments that a plaintiff has elected not to address in its post-remand briefs must be deemed waived.   KYD submits that the trial court has mis-interpreted *Bond Street.*   In *Bond Street* the objections deemed waived had not been fully addressed by the Court and were not presented to the Court for consideration.   In this matter, the issue had been resolved by the Court.   If the trial court's interpretation of *Bond Street*  were to apply, it would require a litigant to present in EVERY remand ALL issues, even those which had been conclusively decided by the Court, in order to preserve the right to appeal those conclusive decisions.   This would render the very concept of gradually limiting the issues still in contention in each remand moot.   Each and every remand would be a complete reconsideration of all issues.

As trial court made a final decision on this issue prior to the second remand, and as the issue did not arise in the second remand, the 8th Amendment argument was not waived by the actions of KYD and is properly before this court.

17

### ii.    The Argument Applying the Eighth Amendment is Meritorious

Both the Defendant's Brief, at pages 37 to 39, and the PRCC brief at pages 27 to 32 argue that the 8th Amendment argument, if before this Court, is not meritorious.  KYD disagrees and submits that the case law is clear and that the 8th Amendment, under the very unique circumstances of this case, is applicable and must ultimately lead to the conclusion that any selected rate based on adverse facts is necessarily excessive.

Initially, as discussed in the brief in chief of KYD, the 8th amendment applies to any fine, penalty or assessment which has something more than a remedial component.  (See *Austin v. United States,* 509 US 602 (1993) and *United States v. Bajakajian* , 534 U.S. 321 (1998)).    It is also clear that the AFA provision is intended to have more than a remedial component.  The purpose of the AFA law is to force cooperation with the Department proceedings and not merely to compensate the United States.  It is intended to protect third parties.  It also has a punishment or deterrence aspect.    All of these factors go beyond remedial and go into the area of deterrence.  Thus the AFA provisions necessarily fall within the scope of the 8th Amendment.

The 8th Amendment is properly before the Court.    KYD further submits that when the Trial Court failed to correctly determine the gateway issue – whether an

18

Antidumping Duty based on AFA and applied to a cooperative interested party has more than a remedial purpose – it never reached the ultimate issue. The ultimate issue is: whether the assessment of antidumping duties based on AFA on a truly cooperative interested party is excessive.

As argued in detail in Plaintiff-Appellant's Brief-in-Chief, <u>any</u> rate calculated on adverse facts which is applied to a fully cooperative interested party is necessarily an excessive fine and forfeiture. Any fine and forfeiture must bear some relationship to the gravity of the offense that it is designed to address. The case law, as discussed in the Brief-in-Chief, leads to the inevitable conclusion that, as applied in this case, the AFA provision is violative of the 8th Amendment. The application of any rate based on adverse facts on a fully cooperative and blameless cooperative interested party is a fine, penalty or assessment which is necessarily excessive.

The antidumping law has been characterized as, in part, a remedial statute. Under the remedial portion of the statute the antidumping duties collected go to the United States public fisc, the compensation is thus to the government. If such compensation to the government is excessive, it is encompassed by the Eighth Amendment's bar against excessive fines. What is necessary is this court's reasonable determination that a calculation of an antidumping rate based on AFA

19

is effectively an excessive fine.  The analysis of the Supreme Court in an action involving the interpretation of a remedial statute is instructive:

> [T]he Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages, without being deemed to have imposed a second punishment for the purpose of double jeopardy analysis. These cases do not tell us, because the problem was not presented in them, **what the Constitution commands when one of those imprecise formulas authorizes a supposedly remedial sanction that does not remotely approximate the Government's damages and actual costs, and rough justice becomes clear injustice**.

*United States v. Halper*, 490 US 435, 446 (1989) (Emphasis added)

Here the calculation based on AFA using an outlier in the data does not remotely approximate a rate for the plaintiff-appellant, a fully cooperative party. The rates for mandatory respondents were in fact much lower, and thus the calculation based on AFA can be seen to be punative and excessive.  This court should apply a rule of reason analysis to find that the application of an AFA calculation to a fully cooperative respondent was improper under the facts of this case.

The rule here proposed by the plaintiff-appellant is one based on the facts of this case.  As suggested by the Supreme Court:

> What we announce now is **a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a**

**prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages** he has caused. **The rule is one of reason**: Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as "punishment" in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment. We must leave to the trial court the discretion to determine on the basis of such an accounting the size of the civil sanction the Government may receive without crossing the line between remedy and punishment.

*Halper*, 490 US 435 at 449 (Emphasis added)

In sum, the Eighth Amendment applies in this matter as the antidumping statute is more than a remedial statute including within it a component for deterrence.   Further, even if it were only a remedial statute, which it is not, it does not evade scrutiny under the Eighth Amendment when the selected rate bears no relationship to the actual experience of the interested party that bears the full impact of the rate.

**2)** **Commerce Erred When It Did Not Consider KYD's Purchase Prices in Determining the Margin Which Would Apply to KYD**

    **i.** **The Department Has Calculated Rates Which Apply to Fully Cooperative Respondents Using Data from Diverse Sources**

Both the Defendant's Brief, at pages 25 to 36 , and the PRCC brief at pages 32 to 34 argue that the data supplied by KYD was unusable because it only contained information which for calculating the U.S. price and does not contain information which provides for normal value. The argument presented is that the Department cannot calculate a margin with such an incomplete record.

However, as noted in KYD's Brief-in-Chief, and in Section A.2.B above, is contrary to the Department's practice. The Department has, on more than one occasion, calculated a rate for a respondent using data which was not submitted by the respondent. In addition to the cases cited by KYD in its Brief-in-Chief, KYD wishes to call this Court's attention to a recent Court of Appeals decision. In *Changzhou Wujin Fine* this Court recently remanded a matter with instructions that the Department of Commerce reconsider the Antidumping Duty rate. This rate was being applied to a cooperative respondent and which had been based, in part, on an AFA component. The Court stated:

> Contrary to Commerce's argument, the AFA statute does not compel this result. Commerce maintains that despite its broad discretion in making antidumping determinations, its hands are tied by

section 1673d(c)(5)(B), which requires that the appellant's separate rate be based on a traditional AFA rate. * * * Such rates are generally based on verified data, see 19 U.S.C. § 1677m(i)(1), and bear a reasonable relationship to the party's actual business practices. See *Gallant Ocean*, 602 F.3d at 1323 (even "[a]n AFA rate must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent" (internal quotation marks omitted)). Substitution of a hypothetical "AFA rate" inapplicable to any individually investigated party is neither suggested nor compelled by the statute, particularly where the sole impact of that substitution will be on cooperating parties.

*Changzhou Wujin Fine,* No. 2011-1080 at 20-21.

Just as importantly, for purposes of this matter, the rate was being calculated based on the Normal Value information supplied by one mandatory respondent and the U.S. price derived from other respondents.[3] <u>None</u> of the data being used was, in fact, the data of the cooperative respondent which had attacked the underlying AFA rate.

In this case, the Department has a full and complete price response from KYD supplying all of the data in its possession.  The Department asked no supplemental questions of KYD as to this data, sought no clarification of the information submitted, and there is no allegation that KYD did not provide all of the information in its possession.  This information on its own may well not be sufficient to calculate a margin for KYD, but the Department has, on more than

---

[3] As noted above, the specific data has not yet been settled, but the legal principle is clear.

one occasion, supplemented the reported data with other information, or even simply disregarded the reported data, and calculated a margin for a cooperative respondent.

### ii. The *Rhone Poulenc* Presumption Doctrine Requires Consideration of KYD's Price Data

The PRCC brief at pages 32 to 35 argues that KYD's price data should not be used because such data is incomplete.   This argument is similar to the argument addressed in Section A.2.A above.    The purpose of the *Rhone Poulenc* presumption is to obtain cooperation from interested parties by requiring them to provide all of the information within their possession.   Implicit in this is usage of such information.   To require the assembly and submission of information which will not be used is certainly not the intent of the AFA provisions of the Antidumping laws.    The price information submitted in this case by KYD is critical and clearly shows, as discussed in KYD's Case Brief in Chief the relationship between the prices paid by KYD and charged by other mandatory respondents.   This price data is telling when determining what margin would have been calculated had KYD's unrelated foreign producers elected to cooperate. Whether or not the information is usable on its own to calculate a rate is irrelevant. Even if the information is not sufficient on its own, it is sufficient as part of the overall analysis.

### iii.   Any Court Decision Would Apply Only To KYD And Not To The Uncooperative Foreign Producers

Both the Defendant's Brief, at pages 31 to 32, and the PRCC brief at pages 30 to 31 essentially argue that the AFA rate applies to KYD because KYD purchased from an uncooperative producer and thus any relief that would be granted to KYD would reward the uncooperative producer. This, it is argued, is mandated by this Court's decision in *KYD, Inc. v. United States*, 607 F.3d 760 (Fed Cir. 2010) ("KYD I") in which the Court held that KYD was not entitled to its own assessment rate[4]. KYD submits that the facts of this case are different and compel a different result. In addition to the Constitutional argument, which was not presented in KYD I, KYD submitted significant facts on the record about its importations, establishing the price it paid and all of the other information in its possession. It also provided significant information about the bad acts of the foreign producer. Neither of these factors were present in KYD I. These distinctions are important.

As a practical matter, any Court decision would now only apply to KYD. This is a consideration which the Court may take into account. As noted in *Changzhou Wujin Fine*:

---

[4] As noted in 19 C.F.R. §351.212(b), the Department calculates assessments for each importer of subject merchandise covered by the review. The Department thus is delegated not only with the authority, but the responsibility to calculate individual assessment rates.

25

> Commerce's Final Remand Redetermination stated that "BWA's data was used to calculate an AFA rate that may be applicable to parties, such as BWA itself, that have failed to cooperate." But at oral argument, counsel for Commerce agreed with the court's statement that "this AFA rate is only being used to calculate the separate rate for the appellant {Jiangsu Jianghai} and for no other purpose," and confirmed that the new rate would not be applied to non-cooperating respondents.

*Changzhou Wujin Fine,* No. 2011-1080 at Fn. 6.  (Citations Omitted).

Neither the foreign producers nor the other importers (if any) challenged the final determination of the Department and/or sought suspension of liquidation. Thus all entries, with the exception of KYD's, would have already liquidated by Customs and Border Protection as a matter of law.  No other entity would benefit from a recalculated rate.  Under the provisions of *Changzhou Wujin Fine* the Department could, in practice, limit the application of any relief to KYD.  Thus any change in the assessment rate would only impact upon KYD.  Any concern that an uncooperative party would benefit from a favorable decision for KYD at this point in the litigation process is simply misplaced.

Secondly, the nature of KYD's cooperation was significantly greater and KYD provided critical information which the domestic industry acknowledged "**raises serious new issues** which were — from Petitioners' perspective — **entirely unexpected**."  (Petitioners Letter of February 4, 2008 at 2, (Emphasis Added) (JA 386.).  But for the actions of KYD, the conduct of the foreign producers might

26

never have been detected and they would have been rewarded in this and potentially future reviews, by potentially avoiding the scrutiny of the Department. In other words, by providing relief to KYD, the Department is more appropriately punishing the bad actors.

### 3)     The Selected AFA Rate Is Not In Accordance With Law

### i.     Corroboration Of The Rate Was Required

In the PRCC brief  at pages 36 to 38, it argues that the rate selected for KYD need not be corroborated as it was obtained from the present review and thus secondary sources are unnecessary.  The PRCC argues that corroboration is only required by statute in certain circumstances, and then jumps to the position that all of the cases in which the reasonableness of the rate is examined (i.e. corroborated) can be ignored.  Under the PRCC's position, a single extreme outlier can form the basis for an AFA rate.

The case law makes it clear that the AFA margin must bear a reasonable relationship to the rate that would apply.  *Gallant Ocean,* 602 F.3d. 1319 at 1323. Whether this is done by statutory corroboration or a review of the rate (de facto corroboration), it is clear that the Department does not have unfettered discretion in selecting a rate and must take into account the facts. This can be seen by contrasting *Ta Chen Stainless Steel Pipe, Inc. v. United States* with *PAM, S.p.A. v. United States*.  In *Ta Chen Stainless Steel Pipe, Inc. v. United States* the margin

was based upon information from that specific segment and in *PAM, S.p.A. v. United States* the margin was based upon information from a prior segment. In both cases the outlier margins were examined to determine the reliability of the selected AFA rates. Both of these types of corroboration serve the same purpose. As noted in *Gallant Ocean*:

> An AFA rate must be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." The purpose of the AFA rate "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." Therefore, although a higher AFA rate creates a stronger deterrent, Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin.

*Gallant Ocean*, 602 F.3d at 1323.

In this matter, the rate bears no relationship with the rate that KYD's exporter would have received had it cooperated and should not have been selected by Commerce.

### ii.    The Rate Was Not Corroborated

In this matter, the Department selected as AFA the single highest outlier margin for a mandatory respondent. No analysis was undertaken as to the relative prices between KYD and the mandatory respondents. There was no explanation as to how this rate bore any relationship to the margin that would have applied to KYD had the unrelated foreign producers cooperated. The selected AFA rate,

which is based on the single highest outlier margin, in fact was of a higher magnitude than that applied to uncooperative respondents in *PAM, S.p.A. v. United States* where the AFA applied was found to be reliable because it was exceeded by several outlier margins.   Here the selected margin is not exceeded by any outlier margins.

Further, as discussed in Section A.2.A above, and in KYD's Brief-in-Chief, the disparity in prices further demonstrate that the selected AFA margin is excessive and does not reflect commercial reality.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff-Appellant KYD requests that this Court reject the arguments presented by Defendant and Defendants-Cross Appellants and find that the Department of Commerce's rate assigned to KYD, Inc on the basis of Adverse Facts does not comport with the law and that this matter should be remanded to the Department of Commerce with instructions that it calculate an appropriate rate for KYD using the price data submitted by KYD.

Respectfully submitted,

/s/ David J. Craven

DAVID J. CRAVEN
RIGGLE & CRAVEN
5515 N. Cumberland Avenue
Ste 803
Chicago, IL 60656
(312) 368-8787

Counsel to Plaintiff-Appellant

February 12, 2013

*Certification of Compliance with Type-Volume Limitation,*
*Typeface Requirements, and Type Style Requirements*

This brief complies with the type-volume limitations of Fed. R. A. Pr. 32 (a)(7)(B) because:

1.      This brief contains 6,656 words, excluding the parts of the brief exempted the word limitations as provided for in Fed R. A. Pr. 32(a)(7)(B)(iii) as measured by the word count feature in Microsoft Office Word 2003.

2.      This brief has been prepared in a proportionally spaced typeface using the serif font Times New Roman in a 14 point size.


/s/ David J. Craven
David J. Craven
Attorney for Plaintiff-Appellant

February 12, 2013

PROOF OF SERVICE

*KYD v. US*, 12-1533

I, David J. Craven, on behalf of KYD, Inc., hereby certify that on or before the 12th Day of February, 2013, the attached public reply brief of Plaintiff-Appellant KYD, Inc. was filed electronically.  Accordingly, this filing was served electronically on all parties by operation of the Court's electronic filing system.

/s/ David J.  Craven

David J. Craven

February 12, 2013